UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAMBERS OF<br>MADELINE COX ARLEO<br>UNITED STATES DISTRICT JUDGE | MARTIN LUTHER KING COURTHOUSE<br>50 WALNUT ST. ROOM 4066<br>NEWARK, NJ 07101<br>973-297-4903 |

March 31, 2025

VIA ECF
All Counsel of Record

### LETTER ORDER

Re:  **The Blessed Day Care Center, Inc. v. Federal Deposit Insurance Corporation, et al.**
**Civil Action No. 20-9910**

Dear Litigants:

Before the Court are Defendants 105 Mill Road, LLC's ("Mill Road") and the Federal Deposit Insurance Corporation's ("FDIC") motions for summary judgment, ECF Nos. 83 and 84, respectively. Plaintiff, the Blessed Day Care Center, Inc. ("BDCC") opposes the motions. See ECF No. 86. For the following reasons, the Defendants' motions are **GRANTED**.

**I.   BACKGROUND**

Every contract entails a promise, but not every promise creates a contract. The present dispute involves the latter scenario.

In 2001, BDCC obtained a $260,000 mortgage loan from City National Bank of New Jersey ("City National" or "the Bank") for the purchase of the property located at 105–109 Mill Road in Irvington, New Jersey (the "Property"). City National's Statement of Undisputed Material Facts ("City Nat'l SUMF") ¶ 1, ECF No. 84.23. Three years later, BDCC entered a second agreement with City National for a $135,000 loan for renovations at the Property. Id. ¶ 2. While the reason for default is disputed, BDCC ultimately defaulted on its loan obligations to City National. Id. ¶ 3. The Bank foreclosed on the Property in 2012 and obtained ownership and control of it in 2014. Id.

Around this time, BDCC's President and Administrator, John Adedoyin, communicated with City National's employees concerning the circumstances surrounding the foreclosure and a potential buy-back of the Property. Id. ¶ 4. It was during Adedoyin's first conversation with City National's then-President and CEO, Preston Pinkett III, that a verbal agreement concerning the Property allegedly first arose. Id. ¶ 9

To be specific, Pinkett purportedly made two promises to Adedoyin involving the Property. First, Pinkett said that the Bank "will not sell the property to anyone else until there is a thorough investigation" concerning Adedoyin's complaints about the foreclosure. See Adedoyin Dep. at

1

15:18–22, ECF No. 86.1.  Second, the Bank would sell the Property back to BDCC if the outcome of the investigation was favorable to BDCC.  Id. at 18:13–18, 22:1–14, 23:14–22.  Pinkett assigned Daniel Volpe, an Asset Recovery Officer with City National, to oversee the investigation.  City Nat'l SUMF ¶ 7; Adedoyin Dep. at 22:1–14.

At the time of Adedoyin's meeting with Pinkett, the parties did not discuss a purchase price for the Property or confirm when the Bank could close on the Property or how the purchase would be financed.  Adedoyin Dep. at 19:22–20:2, 20:10–24.  In fact, Adedoyin testified that he "wasn't sure" how much financing he would need, id. at 25:8–11—though he knew the Bank "w[ould] not return the building back to [him] free of charge," id. at 19:6–7.  Instead, Adedoyin believed he just "ha[d] to wait to see [the Bank] come up with their investigation; to see the conclusion of the investigation," id. at 22:6–9, and, in the meantime, he would "look[] around to make sure [he] ha[d] the money ready when [the Bank was] ready to go," id. at 24:18–24, despite the lack of any agreed upon purchase price.

The investigation, according to Adedoyin, lasted around three years.  Id. at 26: 13–15. And, though Volpe allegedly refused to formally convey the results of the investigation, id. at 32:11–22, Adedoyin testified that Volpe verified that Adedoyin's concerns regarding the foreclosure were legitimate, id. at 32:1–4, 36:6–12.

While the investigation was pending, the parties did not come to any agreement concerning the terms of any purchase.  See generally id. at 27–29.  But after the investigation concluded, the parties began to negotiate, and those discussions continued throughout 2017 and part of 2018.

On July 6, 2017, Volpe emailed Adedoyin and stated: "John: Your cash offer of $200,000.00 was NOT accepted by the bank."  City Nat'l SUMF ¶ 18; Steinfeld Cert., Ex. F, ECF No. 84.8.  Adedoyin emailed back requesting that the Bank "reconsider" his offer of $200,000, and Volpe forwarded that email to another Bank employee, David Scheck, a Senior Credit Officer, for his review.  City Nat'l SUMF ¶¶ 6, 20; Steinfeld Cert., Ex. G, ECF No. 84.9.  That second offer was likewise denied, but Volpe indicated that the Bank would "**consider**" a sale if Adedoyin increased his offer to $300,000.  Steinfeld Cert, Ex. H (emphasis in original), ECF No. 84.10; City Nat'l SUMF ¶ 23.  The parties continued to exchange emails concerning Adedoyin's $200,000 offer, see City Nat'l SUMF ¶¶ 25–27, and Volpe, yet again, informed Adedoyin that "[t]he bank has declined to sell you the property for $200,000.00 and is unable to provide any financing for the acquisition.  This is the final decision and we are unable to further assist you," id. ¶ 28; Steinbeck Cert., Ex. K, ECF No. 84.13.  Adedoyin confirmed that the parties did not have any agreement with respect to the purchase price of the property by the end of July when Volpe conveyed the Bank's final decision and that the parties were still in negotiations.  See City Nat'l SUMF ¶ 29; Adedoyin Dep. at 79:4–80:16.

At some point, Scheck purportedly took over communications concerning the property from Volpe.

In October 2017, Scheck emailed Adedoyin and said: "[s]end me a written offer and the other materials requested as soon as possible."  City Nat'l SUMF ¶ 30; Steinfeld Cert., Ex. L, ECF No. 84.14.  While Scheck's email indicates the parties were in meaningful discussions concerning the Property—indeed, Scheck also noted in that email that "[the Property] would soon be

[Adedoyin's]," Steinfeld Cert., Ex. L—Adedoyin confirmed that at that point, the parties were still negotiating, and "that City National required a written offer and other materials for Plaintiff's potential purchase of the Property." Compare City Nat'l SUMF ¶ 31, with BDCC's Statement of Undisputed Material Facts (BDCC's SUMF") ¶ 31, ECF No. 86.9; Adedoyin Dep. at 80:17–81:14, 92:14–93:4. Adedoyin could not "recollect . . . what [offer he] sent to Scheck at that time." Adedoyin Dep. at 93:7–94:2.

Fast forward another six months to April 2018, Scheck emailed Adedoyin to inform him that the Property was not under contract. Second Amended Complaint ("SAC"), Ex. B, ECF No. 38.2. Scheck also noted that a John Williams from Christian Funding had informed Scheck that Adedoyin had not responded to his calls. Id. Christian Funding was an organization to which Scheck referred Adedoyin. Adedoyin Dep. at 127:18–21. This was part of Scheck's larger effort to "help [Adedoyin] look for a loan," "because the bank was not ready to give him a loan." Id. at 98:5–15, 102:6–18.

It was also around the time of this email, according to Adedoyin, that Scheck verbally agreed to accept $250,000 for the Property.[1] Id. at 97:7–25. Though, at times throughout his deposition, Adedoyin testified that Scheck indicated the Bank would only "possibly consider $250,000" or "probably accept" that figure. Id. at 107:5–9.

Around April 23, 2018, City National signed a contract with Defendant Mill Road for the sale of the Property for $225,000. City Nat'l SUMF ¶ 32. Mill Road is an LLC managed by Yitzhak Zelmanovich ("Zelmanovich") and his father, Zindel Zelmanovich. Zelmanovich Dep. at 22:9–25:11, ECF No. 86.5. Despite the contract, communications continued between Scheck and Adedoyin.

In early June 2018, Scheck emailed Adedoyin and stated that Scheck would "call Bank counsel and the counterparty to the sale contract after you tell me how much you are willing to pay for the structure and demonstrate proof of funds to close on or before [June 30]." City Nat'l SUMF ¶ 33; Steinfeld Cert., Ex. N, ECF No. 84.16. In response, Adedoyin sent Scheck the bank statement of an individual named Catherine Joan Adago as "proof of funds," but did not name a purchase price. City Nat'l SUMF ¶ 35; Steinfeld Cert., Ex. O, ECF No. 84.17. Scheck clarified that the Bank would require a more up to date bank statement and expressed that "the Bank does not know Catherine Joan Adago and expects she will be the contract purchaser listed in the DRAFT contract that the Bank assumes will contain your offer price." Id. Adedoyin never clarified who Catherine Joan Adago was. Scheck Dep. at 115:1–116:22, ECF No. 86.3.

In mid-July, Adedoyin made another attempt at securing the Property. This time, Adedoyin's attorney emailed Scheck with a letter from a financing company, Tradewinz, as well as a "proposed contract" for Scheck's "review." City Nat'l SUMF ¶¶ 37–38; Steinfeld Cert., Ex. P, ECF No. 84.18. The attorney indicated that "[Adedoyin] is prepared to close as soon as possible" and that a "deposit will be paid as soon as we agree on a closing date." Id. The contract listed a purchase price of $250,000 and indicated the buyer would be John Adedoyin, rather than BDCC.

---

[1] Adedoyin struggled to identify when precisely Scheck allegedly agreed to accept $250,000 for the Property. Adedoyin testified it was around April 2018 when the parties came to that agreement, see Adedoyin Dep. at 97:17–21, but at other times more vaguely suggested that Scheck's agreement came after the Bank rejected BDCC's offer for $200,000, id. at 96:11–18, or after Scheck took over communications from Volpe, id. at 97:13–14.

Steinfeld Cert., Ex. P. Adedoyin testified that his counsel submitted the written contract because he thought his counsel "should put something in writing instead of communicating with Scheck over the phone." Adedoyin Dep. at 60:7–13.

In response to the above offer, Scheck advised Adedoyin's counsel that the Bank had already signed a contract for the Property with a third party, and that "[i]f, for some reason, the contract is terminated, [he would] let [them] know." City Nat'l SUMF ¶ 46; Steinfeld Cert., Ex. Q, ECF No. 84.19. Scheck again emailed Adedoyin's counsel, seemingly in response to a phone call the Bank received, and stated that "[a] contract is a legal agreement. The Bank adheres to its obligations so it will not unilaterally cancel an agreement without cause. If the contract expires the Bank will contact you. You need not call the Bank." City Nat'l SUMF ¶ 47; Steinfeld Cert., Ex. Q.

Adedoyin admits that City National never signed the contract that his counsel sent, and that he never put down a deposit in connection with the contract. Compare City Nat'l SUMF ¶ 48, with BDCC SUMF ¶ 48.

On July 30, 2018, Adedoyin emailed Scheck to say that "I am still counting on you and on your promise that you said you will not allow the Bank to sell my property. This was your promise the very first day I met you. . . . Just . . . tell me when you want me to pick up the keys and when and how you want your check." SAC, Ex. G, ECF No. 38.7. And even into August 2018, the parties continued to communicate concerning the Property. Adedoyin emailed Scheck on August 8, 2018, noting that he sent the Bank "every DOCUMENT through [his] Lawyer" and that he had "the money that the Bank asked [him] to come up with." SAC, Ex. H, ECF No. 38.8. Scheck responded that he "w[ould] speak with the individual negotiating the contract on behalf of the Bank and share these worthwhile points with him. Perhaps he w[ould] come to his senses and immediately work to enter a contract with [Adedoyin]." Id.

The sale to Mill Road closed on October 3, 2018. City Nat'l SUMF ¶ 65; Steinfeld Cert., Ex. S, ECF No. 84.21.

In November 2019, the Office of the Comptroller of Currency closed City National Bank and appointed the FDIC as receiver for the Bank. City Nat'l SUMF ¶ 66. BDCC filed a proof of claim with the FDIC-Receiver as a creditor of the Bank, which was denied on June 2, 2020. See SAC ¶ 42.

BDCC sued the FDIC in August 2020. See ECF No. 1. The Court dismissed BDCC's initial complaint for lack of jurisdiction and for failure to state a claim. See ECF Nos. 6, 13. On August 21, 2021, Plaintiff filed its First Amended Complaint ("FAC"), asserting one claim for breach of the covenant of good faith and fair dealing against City National. See ECF No. 14. The Court granted FDIC's motion to dismiss the FAC, see ECF No. 16, in part, permitting the count to go forward, but dismissing the FAC against FDIC in its corporate capacity, see ECF No. 21 at 5.

BDCC then filed its SAC, newly asserting claims against Pinkett, Volpe, and Scheck. See generally SAC. The SAC also asserted counts against Mill Road for tortious interference with contract, tortious interference with prospective economic advantage, and conversion. See id. ¶¶ 97–115. This Court dismissed all counts against Pinkett, Volpe, and Scheck. See ECF No. 71.

4

The parties took discovery, and Defendants have now moved for summary judgment. See ECF Nos. 83, 84.

## II. DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(a), the Court will grant a motion for summary judgment if the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Scanlan v. Am. Airlines Grp., 102 F.4th 164, 170 (3d Cir. 2024). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020). The Court construes all facts and inferences in the light most favorable to the non-moving party. See id. At the summary judgment stage, the Court's role is not to weigh the evidence and determine the ultimate truth of the allegations. Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019). Keeping in mind these well-established standards, the Court addresses the Defendants' arguments in support of their motions.

### A. Breach of the Covenant of Good Faith and Fair Dealing against the Bank

As set forth above, BDCC brings one count for the breach of good faith and fair dealing against the Bank.

"Under New Jersey law, all contracts include an implied covenant that the parties to the contract will act in good faith." Kenny v. Onward Search, No. 15-0456, 2015 WL 1799593, at *3 (D.N.J. Apr. 15, 2015) (internal citations omitted). To state a claim for breach of the covenant of good faith and fair dealing, a plaintiff must allege:

> (1) a contract exists between the plaintiff and the defendant; (2) the plaintiff performed under the terms of the contract [unless excused]; (3) the defendant engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the plaintiff of the rights and benefits under the contract; and (4) the defendant's conduct caused the plaintiff to suffer injury, damage, loss or harm.

Creative Concepts Mfg. Ltd. v. Team Beans LLC, No. 17-6066, 2018 WL 2002800, at *4 (D.N.J. Apr. 30, 2018).

Here, the FDIC argues that BDCC cannot establish the first prong—that a contract exists between the parties—because the "undisputed evidence conclusively refutes [BDCC's] claim of an oral agreement for the purchase of the [P]roperty."[2] See ECF No. 84.24 at 22–28.

Indeed, "without a contract, there can be no recovery for breach of an implied covenant of good faith and fair dealing." Byrd v. Fed. Express Corp., No. 05-2648, 2008 WL 11425673, at *6 (D.N.J. Mar. 4, 2008). So, this Court focuses its analysis on whether there existed any oral agreement between BDCC and the Bank for purchase of the Property, addressing other prongs of

---

[2] FDIC also argues that BDCC's claim is barred by 12 U.S.C. § 1821(d)(9)(A). See ECF No. 84.24 at 28–35. Having determined that BDCC's claim against the FDIC fails on alternative grounds, the Court will not address this second contention.

5

the test where necessary.

Generally speaking, "[a] contract arises from [an] offer and acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable clarity." Weichert Co. Realtors v. Ryan, 608 A.2d 280, 284 (N.J. 1992) (quotation marks omitted). As such, if the parties "agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." Id.

In certain situations, the Statute of Frauds allows the enforcement of oral agreements for the sale of real property if "a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by clear and convincing evidence." N.J.S.A. 25:1–13(b); see Smith v. Vieceli, No. A-2699-21, 2024 WL 3421614, at *4 (N.J. Super. Ct. App. Div. July 16, 2024).

"Specifically, 'the existence of an [oral] agreement between the parties as well as its essential terms must be proved by clear and convincing evidence.'" Morton v. 4 Orchard Land Tr., 849 A.2d 164, 168 (N.J. 2004) (quoting New Jersey Law Revision Commission's commentary to then-proposed N.J.S.A. 25:1-13b). In addition, the parties to the purported contract must "'manifest[] an intent to enter into an oral agreement,' not just the written agreement." Smith, 2024 WL 3421614, at *5 (alterations in original) (quoting Morton, 849 A.2d at 171). Cf. Morton, 849 A.2d at 171 (concluding that an oral contract did not exist where "[t]he sale of the Orchard Court property was not expected to end on the basis of a handshake or a verbal utterance by the Trustees to the realtor."). To aid in this determination, the Court looks to "the circumstances surrounding the negotiations, . . . the relationship of the parties, [and] the parties' contemporaneous statements and past dealings." Morton, 849 A.2d at 171.

While BDCC's characterizations of the promises exchanged between the parties have been somewhat of a moving target, the Court can identify three purported verbal commitments:

First, BDCC argues that, sometime after the foreclosure, Pinkett promised the Bank would not sell the Property pending the Bank's investigation into Adedoyin's claims about the foreclosure. See ECF No. 86 at 6 (citing Adedoyin Dep. at 15–19).

Second, if BDCC's claims had merit, Pinkett promised that the Bank would sell the Property back to BDCC.[3] Id.

---

[3] In the SAC, BDCC's characterization of this oral commitment is slightly different than in its briefing. BDCC alleges, as to Pinkett's second promise, that Pinkett "assured Adedoyin that the Property would not be sold to any third party if the findings of the investigation supported [BDCC's] claims," see SAC ¶ 22, not that the Bank would sell it back to BDCC if the investigation's results were favorable, see ECF No. 86 at 6. The Court, however, finds that these two promises are effectively the same. At bottom, BDCC's claim for breach of the covenant of good faith and fair dealing is predicated on the Bank's failure to sell the property back to BDCC and its choice to sell it to Mill Road instead. In other words, the whole premise of any promise not to sell to a third party is interconnected with a promise to sell to BDCC. It is not apparent that BDCC expected the Bank to maintain the ownership of the Property in perpetuity as long as it did not sell it to someone else. BDCC wanted to purchase the Property per the negotiated terms.

Third, while the timeline is somewhat unclear, see supra note 1, BDCC alleges that after the investigation completed, Scheck "continued" the Bank's earlier commitment to not sell the Property to a third party, SAC ¶ 25, and to sell the Property to BDCC "if [Adedoyin] secured financing in the amount of [$250,000]," SAC ¶ 28.[4]

The covenant of good faith and fair dealing was allegedly breached when the Bank "fail[ed] to sell the Property to Blessed Day Care despite Blessed Day Care meeting the negotiated terms." See SAC ¶¶ 49–56.

### 1. Pinkett's Promises

With regard to the discussions between Adedoyin and Pinkett, the Court can identify what appears to be two alleged promises from Pinkett: First, the Bank would not sell the Property pending an investigation into the foreclosure. Second, if the results of the investigation favored BDCC, the Bank would sell the Property back to BDCC. See ECF No. 86 at 6; Adedoyin Dep. at 15:18–22, 18:13–18, 22:1–14, 23:14–22.

Starting with Pinkett's second promise—"that the Bank would sell the property back to [BDCC]" if "Adedoyin's claims [about the foreclosure] had validity," ECF No. 86 at 6—the Court determines that there exists no enforceable contract. Even assuming that the condition underlying this promise, that Adedoyin's claims were valid, was satisfied—indeed, Adedoyin testified that Volpe informed him that his concerns had merit, see Adedoyin Dep. at 32:1–4, 36:6–12—the parties did not agree on the essential terms of the sale, a pre-requisite to an enforceable oral agreement, see Morton, 849 A.2d at 168.

For example, Adedoyin concedes that he and Pinkett did not even discuss a potential purchase price when they met, Adedoyin Dep. at 19:22–20:2, 20:10–24, which has been deemed "an essential term of any contract." Blue Sky 1, LLC v. Jaguar Land Rover N. Am., LLC, No. 16-207, 2016 WL 6803081, at *7 (D.N.J. Nov. 16, 2016) (emphasis added). That the parties planned to negotiate down the line does not change the outcome: "[T]he law treats an 'agreement to agree' upon material terms at a future time as an unenforceable indefinite promise." Bressman v. J&J Specialized, LLC, No. A-5550-11T1, 2013 WL 6331714, at *7 (N.J. Super. Ct. App. Div. Dec. 6, 2013) (citing Williston on Contracts 4:29 (Lord ed. 2007)).

BDCC's reliance on Bank meeting notes that indicate that the Bank "plann[ed] to sell [BDCC] back to [its] owner . . . if they [had] financing," see ECF No. 87 at 2, likewise does not move the needle. Assuming Pinkett did say he would sell the Property back on the condition that BDCC procured appropriate financing, this still does not suggest the parties agreed on essential terms. Indeed, as set forth above, Adedoyin acknowledged he knew the Bank "w[ould] not return

---

[4] BDCC's pleadings with respect to Scheck could be construed as detailing two promises: one to not sell to a third party, SAC ¶ 25, and one to sell to BDCC for $250,000 if BDCC could procure funding, SAC ¶¶ 28, 52. As with the commitments allegedly made by Pinkett, see supra note 3, Scheck's promises are really two sides of the same coin. Again, the gravamen of BDCC's pleadings, and its alleged harm, is that the Bank breached its promise to sell the Property back to BDCC, instead selling it to Mill Road. SAC ¶¶ 49–57. Cf. id. ¶ 35 (describing Scheck's verbal agreement as one "that City National would not sell the Property to anyone other than Mr. Adedoyin"); id. ¶ 37 (describing the verbal agreement as "to sell the Property to Blessed Day Care"). Accordingly, the Court treats this as a single alleged verbal commitment.

7

the building back to [him] free of charge," Adedoyin Dep. at 19:6–7, and stated that he "wasn't sure" how much financing he would need, id. at 25:8–11. As such, Pinkett's verbal promise to sell the Property back to BDCC is not an enforceable contract.[5]

Pinkett's first promise—that the Bank would not sell the Property pending an investigation—also does not preclude summary judgment.

Even assuming it constituted a valid contract,[6] it is not apparent from BDCC's pleadings that its claim against the Bank for breach of the covenant of good faith and fair dealing is predicated on this distinct promise from Pinkett to Adedoyin. Although Pinkett's promise is mentioned in other portions of BDCC's SAC, see, e.g., SAC ¶¶ 22, 59–60, the gravamen of BDCC's pleadings for this count is that "there was a valid contract between Blessed Day Care and City National based on the promises and requests of City National executives and a valid offer to sell Blessed Day Care the Property for $250,00[0].00 provided that Blessed Day Care could secure the funds," and that "City National breached its duty owed to Blessed Day Care by failing to sell the Property to Blessed Day Care despite [it] meeting the negotiated terms."[7]  SAC ¶¶ 52–54.

---

[5] Nor is the promise an enforceable option contract. "In a real estate transaction, an option contract is a unilateral agreement requiring a party to convey property at a specified price, provided the option holder exercises the option in strict accordance with the terms and time requirements of the contract." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 395 (N.J. 2005) (emphasis added) (quotation marks omitted). "When an optionee exercises his option, a mutually enforceable contract of sale arises. It is then no longer an option contract but a contract for the sale of real estate." State By and Through Adams v. N.J. Zinc Co., 193 A.2d 244, 253 (N.J. 1963) (cleaned up). Even construing Pinkett's promise to sell the Property back to BDCC if the investigation's results were favorable as an option rather than a contract for the sale of property, the agreement still did not establish the most basic terms to be enforceable, such as specifying a price.

[6] In its motion for summary judgment, Mill Road raises legitimate concerns that any contract to not sell the Property pending an investigation would be unenforceable, as it was not supported by consideration. See ECF No. 83.8 at 5–6 ("In addition, the alleged 'Verbal Agreement' between Mr. Pinkett and Mr. Adedoyin that [the Bank] would not sell the Property pending its investigation into the foreclosure is not an enforceable contract. Mr. Pinkett testified that he never promised Mr. Adedoyin that the Bank would not sell the Property to a third party. Even if he had made such a promise, however, that promise would have been unenforceable because, as Mr. Adedoyin admitted in his deposition, Plaintiff never provided or agreed to provide the Bank with the consideration necessary to make that promise enforceable." (citations omitted)); see also ECF No. 83.1 ("Mill Road SUMF") ¶ 11. BDCC does not respond to this argument in its opposition briefing. BDCC vaguely refers to the fact that it did not take action against the Bank while the investigation was pending, but it is not clear whether BDCC intended to argue that its forbearance constituted legal consideration. See ECF No. 86 at 8. Further, in its statement in response to Mill Road's SUMF, BDCC suggests that Adedoyin's commitment to look for funding while the investigation was pending constituted consideration to support an agreement not to sell during the investigation. ECF No. 86.10 ¶ 11. But BDCC does not incorporate this distinct argument into its briefing. Durkin v. Wabash Nat'l, No. 10-2013, 2013 WL 1314744, at *6 (D.N.J. Mar. 28, 2013) ("[A]rguments as to the force of [the] facts [raised in a Rule 56.1 statement] belong[] in the brief."). Because the Court can resolve this matter without determining whether adequate consideration supported this oral agreement, it will not decide this issue at this juncture.

[7] BDCC's opposition to the Defendants' motions newly emphasizes Pinkett's first promise, arguing that "[t]he oral agreement [at issue] was for the Bank not to sell the Property until an investigation completed regarding the . . . foreclosure," and that "the results of the investigation have not been formally provided to Plaintiff." ECF No. 86 at 7–8. Defendants argue that this constitutes an impermissible amendment to the pleadings in an effort to shift the focus from Pinkett's unenforceable promise to sell the Property back to BDCC to his promise to forego a sale pending the Bank's investigation. See ECF No. 91 at 9. Indeed, BDCC's pleadings specifically identify the relevant contract for

Nonetheless, the Court still concludes that no reasonable juror could find that the Bank breached the covenant of good faith and fair dealing with respect to Pinkett's first promise because BDCC has failed to establish that the Bank "engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the plaintiff of the rights and benefits under the contract." Creative Concepts, 2018 WL 2002800, at *4.

First, while "[a] defendant may be liable for a breach of the covenant of good faith and fair dealing even if it does not violat[e] an express term of a contract," Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 396 (N.J. 2005) (quotation marks omitted), it bears noting that the Bank did not sell the property to anyone pending the three-years long investigation into the foreclosure, in compliance with Pinkett's alleged verbal agreement.

Second, BDCC has not demonstrated, with respect to this specific promise, that "its reasonable expectations [have been] destroyed" because the Bank "act[ed] with ill motives and without any legitimate purpose," or that "it relie[d] to its detriment on [the Bank's] intentional misleading assertions." Id. at 396 (summarizing New Jersey case law concerning the application of the covenant). To the contrary, Adedoyin testified that: (1) the Bank did perform an investigation, see Adedoyin Dep. at 26:4–12; (2) the investigation, while lengthy, was completed, id. at 26:13–15, 31:21–24; (3) the results of that investigation were communicated, albeit informally, to Adedoyin, id. at 31:25–32:22; (4) the results of the investigation were favorable to BDCC, id. at 32:1–4, 36:4–12; and (5) BDCC, in line with Pinkett's second alleged promise, negotiated with the Bank to purchase the property, which it could only do if the investigation was completed and its claims had merit, see, e.g., id. at 23:14–22 (acknowledging that if the Bank determined there was no issue with the foreclosure, Adedoyin would have to "live with . . . whatever their conclusion is").

While BDCC's opposition emphasizes that the results of the investigation were never formally provided to Adedoyin, BDCC does not meaningfully argue that this destroyed its reasonable expectations concerning Pinkett's promise to investigate, or that the Bank lacked any legitimate purpose in declining to share those results. ECF No. 86 at 8. Adedoyin testified that Volpe indicated his claims had merit but did not share the report because it was a privileged internal document. Adedoyin Dep. at 32:10–22. While Adedoyin offhandedly suggested that Volpe's explanation was somewhat pretextual, see id. ("I believe that maybe when he was kind of fed up with my visits to his office, that was when he said they find out that the money was not actually given to me and that he had written a report and that the report has gone to . . . the president. And I asked for a copy of the report . . . [a]nd he said no because it was an internal memo."), he does not argue that the Bank's declination to share its internal documents prevented the completion of the investigation or disadvantaged his negotiations regarding the Property. Accordingly, any claim for breach of the covenant fails.

---

Count 1 as that to sell the Property for $250,000 provided BDCC could secure funds, see SAC ¶ 52, not the agreement to retain the Property during Volpe's investigation. Because the Court resolves this issue on alternative grounds, however, it does not determine whether this constitutes an impermissible amendment.

9

### 2. Scheck's Promise

Several years later, after Pinkett's "initial" promises to investigate the foreclosure and sell the Property to BDCC, Scheck allegedly continued to promise that the Bank would not sell the Property to a third party and would instead sell it to BDCC for $250,000, assuming BDCC could obtain the funding. See SAC ¶¶ 25, 28, 52.

To the extent BDCC still contends that Scheck made a distinct enforceable promise to BDCC—indeed, BDCC's opposition omits any clear reference to Scheck's representations to Adedoyin, instead focusing completely on Pinkett's promises, see ECF No. 86 at 7–8—the Court determines that Scheck, like Pinkett, did not bind the Bank.

First, as with Pinkett, it appears to the Court that the parties did not agree on the essential terms of a contract to sell the Property back to BDCC. Throughout his deposition testimony, Adedoyin admits that the parties were still "negotiating," even as late as October 2017, when Scheck asked Adedoyin to send Scheck "a written offer and the other materials requested as soon as possible." See Steinfeld Cert., Ex. L; City Nat'l SUMF ¶¶ 30–31; BDCC SUMF ¶ 31.

While the exact timeline appears uncertain, Scheck allegedly communicated around April 2018 that the Bank would accept $250,000 for the Property. See Adedoyin Dep. at 97:7–25. Even so, that purported oral agreement has not been "proved by clear and convincing evidence." See Morton, 849 A.2d at 168 (quotation marks omitted). In his deposition, Adedoyin testified that Scheck indicated that the Bank would only "possibly consider $250,000" or "probably accept" that figure. Adedoyin Dep. at 107:5–9. Further, Scheck's email exchanges with Adedoyin in June 2018 indicate that Scheck did not know how much BDCC would offer for the Property or how BDCC planned to finance its purchase. See Steinfeld Cert., Ex. N.

In addition, it is readily apparent that an oral agreement would have been insufficient for the Bank. Adedoyin acknowledges throughout his deposition, and the record corroborates, that the parties were uncomfortable proceeding orally. Scheck consistently requested that Adedoyin put his offers for the Property in writing, Adedoyin Dep. at 80:17–81:14, 92:14–93:4; see also Steinfeld Cert., Exs. L & O, and Adedoyin himself requested his attorney "put something in writing instead of communicating with Scheck over the phone," Adedoyin Dep. at 60:7–13. In addition, Adedoyin sent the Bank a written contract with his proposed terms of sale, see Steinfeld Cert., Ex. P, further indicating that "the sale of the [Property] was not expected to end on the basis of a handshake or a verbal utterance."[8] Morton, 849 A.2d at 171.

Finally, out of an abundance of caution, the Court addresses other record evidence that, in an earlier order, the Court reasoned could suggest an enforceable oral agreement. See ECF No. 21 at 4 n.3. Now viewed with entirety of the record, Scheck's statement via email that "the property would soon be [Adedoyin's]," Steinfeld Cert., Ex. L, and Adedoyin's email to Scheck stating that "I am still counting on you and your promise that you said you will not allow the Bank to sell my property," and to "tell me when you want me to pick up the keys and when and how you want your

---

[8] The record also indicates that BDCC's prior mortgage with the Bank for the Property and renovation loan were not mere oral agreements. See SAC ¶¶ 10–11.

check," SAC, Ex. G, may indicate a willingness to sell the Property to BDCC once material terms were agreed upon and if the agreement was finalized in writing. But these statements certainly do not satisfy the "clear and convincing" standard to establish the existence of an enforceable oral agreement.

In short, an "oral agreement is not suggested by the circumstances surrounding the negotiations, or by the relationship of the parties, or by the parties' contemporaneous statements and past dealings." Morton, 849 A.2d at 171. At best, the record demonstrates unenforceable promises and negotiations that, unfortunately for BDCC, did not culminate in binding, written instrument for sale of the Property. As such, summary judgment is appropriate.

### B. Mill Road's Motion for Summary Judgment

As set forth above, BDCC asserts three claims against Mill Road: (1) tortious interference with contract; (2) tortious interference with prospective economic advantage; and (3) conversion. SAC ¶¶ 97–115. The Court finds that summary judgment should be granted for Mill Road as to these claims.

#### 1. Tortious Interference Claims

As an initial matter, claims for tortious interference require a plaintiff to demonstrate "a protected interest—either a prospective economic or contractual relationship." See Baxter Healthcare Corp. v. HQ Specialty Pharma Corp., 157 F. Supp. 3d 407, 420 (D.N.J. 2016). Because the Court has determined that the relevant interest at stake—here, the promise "not to sell the Property to any third party and to sell the Property back to Blessed Day Care if Blessed Day Care was able to secure $250,000.00 in financing," SAC ¶ 98—does not constitute a contract, the Court concludes that summary judgment is appropriate as to BDCC's claim for tortious interference with contract. See Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc., 256 F. Supp. 2d 249, 288 (D.N.J. 2003) ("[A] tortious interference with contractual relations claim requires proof of an existing contract.").

Claims for tortious interference also require a plaintiff to prove that a defendant's interference was malicious, meaning that the defendant acted with intent, or actual knowledge of the contractual relationship. See Baxter Healthcare, 157 F. Supp. 3d at 420. A showing of malice does not require ill will, but rather that a defendant's actions have risen to "sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated." Id. at 420 n.38 (quotation marks omitted). Said differently, the conduct at issue "must be transgressive of generally accepted standards of common morality or of law." Lamme v. Client Instant Access, LLC, No. A-2689-20, 2022 WL 1276123, at *4–5 (N.J. Super. Ct. App. Div. Apr. 29, 2022) (quotation marks omitted); see also Romspen Robbinsville, LLC v. Twp. of Robbinsville, No. 20-3248, 2022 WL 17251127, at *12 (D.N.J. Nov. 28, 2022) ("Malice is the intentional doing of a wrongful act without justification or excuse. Wrongful acts include violence, fraud, intimidation, misrepresentation, criminal or civil threats, and/or violations of the law." (cleaned up)).

While a defendant's "motivation to enhance his financial position for profit" can amount to malice when "his conduct [was] transgressive of generally accepted standards of morality,"

Leslie Blau Co. v. Alfieri, 384 A.2d 859, 867 (N.J. Super. Ct. App. Div. 1978), "the loss of a business opportunity that is the result of competition is not cognizable," Romspen, 2022 WL 17251127, at *12.  Defendant needed to have employed "devious, improper, and unrighteous means" to interfere.  Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 36 (N.J. 1989).

"Ultimately, malice is determined on an individualized basis, and the standard used by the court must be flexible, viewing the defendant's actions in the context of the case presented." Lamme, 2022 WL 1276123, at *5 (cleaned up).

Among other things, Mill Road argues that these counts "fail because [BDCC] has not produced any evidence that [Mill Road] acted intentionally and maliciously in purchasing the Property."  ECF No. 83.8 at 6.  By contrast, "the discovery record is devoid of any evidence that anyone connected to [Mill Road] was even aware of Mr. Pinkett's alleged promise not to sell 105 Mill Road to a third party at the time that the company agreed to purchase the Property."  Id.

In its opposition briefing, BDCC cites to deposition testimony from Pinkett and Zelmanovich that BDCC argues demonstrates a prior "relationship between the owners of Defendant [Mill Road] and the executives of the Bank, which resulted in the sale of the Property to [Mill Road] for an amount less than that demanded of Plaintiff."  ECF No. 86 at 12.

BDCC also cites to an April 4, 2018 email from Walter Bond, another Bank executive working on the sale of Mill Road, to Zelmanovich, which states: "please be sure the price stays at $235k.  With that I can hold off the competing forces."  ECF No. 86.7.  And, while not in its briefing, BDCC's statement of material facts notes that Adedoyin attended a city variance hearing where he discovered that Mill Road was using "architectural drawings that [Adedoyin] had commissioned on behalf of [BDCC] . . . further supporting the notion that representatives of [Mill Road] may have been aware of [BDCC's] existence at the time they entered into the contract" for the Property.  ECF No. 86.10 ¶¶ 17, 23.

Assuming, arguendo, that Mill Road was aware of BDCC's existence when it purchased the Property, and that it had knowledge of BDCC's interest in the Property,[9] the record is devoid of any evidence that Mill Road's conduct leading up to its purchase was "devious, improper, [or] unrighteous."  See Printing Mart, 563 A.2d at 36.

Even if Pinkett and Zelmanovich knew each other before Mill Road's purchase of the Property, or Zelmanovich had prior business relationships with the Bank, BDCC has not demonstrated how those connections could establish malice on the part of Mill Road.

The email from Bond to Zelmanovich likewise does not support a finding of malice, nor does the fact that the Bank sold the Property to Mill Road at a lower price than BDCC offered.  A bare acknowledgement that there were "competing forces" concerning the disposition of the Property reveals, at most, that the parties were in competition with each other, Romspen, 2022 WL

---

[9] Zelmanovich testified that he first became aware of BDCC only after BDCC initiated litigation in state court to block the sale.  Zelmanovich Dep. at 41:3–25.  He also testified that he had no reason to believe that his father—with whom Zelmanovich transacted business with—knew about BDCC until months after Mill Road signed a purchase contract for the Property, or that the Bank ever referred to the Property as "Blessed Day Care."  Id. at 61:7–62:2.

12

17251127, at *12 ("[T]he loss of a business opportunity that is the result of competition is not cognizable."), and the Bank's choice to move forward with a lower bid does not indicate that Mill Road engaged in "conduct [that was] transgressive of generally accepted standards of morality," Leslie Blau, 384 A.2d at 867. Indeed, purchase price is but one of many factors considered when negotiating the sale of a property.

Finally, as to the architectural drawings, Adedoyin testified that he spoke with the architect who initially made his drawings at the variance meeting and asked the architect why he was using the drawings for another client, Mill Road. Adedoyin Dep. at 189:3–15. As such, it is not apparent that Mill Road engaged in any misconduct whatsoever concerning the allegedly identical drawings. Further, BDCC has not demonstrated how Mill Road's use of the drawings has influenced or interfered with the Bank's choice to sell to Mill Road.

### 2. Conversion

To establish conversion under New Jersey law, a plaintiff must establish that (1) the defendant wrongfully exercised dominion or control over the property of another; (2) the property was taken without authorization; and (3) the property was taken to the exclusion of the owner's rights to it." Jurista v. Amerinox Processing, Inc., 492 B.R. 707, 753 (Bankr. D.N.J. 2013). To satisfy this first prong, a plaintiff must show that "the property and right to immediate possession thereof belong to the plaintiff." Artwide Int'l H.K. Ltd. v. Foster, No. 22-6417, 2023 WL 8064282, at *3 (D.N.J. Nov. 21, 2023).

Here, BDCC alleged that it "fulfilled its obligations under the Verbal Agreement with City National"—i.e., securing the requisite funding—"which created a possessory right in the Property." SAC ¶ 112. But, as set forth above, BDCC does not have any enforceable agreement concerning its purchase of the Property, and therefore no possessory interest in it. As such, BDCC's claim for conversion fails.

### III. CONCLUSION

Based on the foregoing, Defendants motions for summary judgment, ECF Nos. 83, 84, are **GRANTED**. This case is **CLOSED**.

                                                     SO ORDERED.

                                                     *s/ Madeline Cox Arleo*
                                                     **MADELINE COX ARLEO**
                                                     UNITED STATES DISTRICT JUDGE